You may call the next case. Morning, yes. May it please the court, my name is David Mamie, I represent the plaintiff, Louis Danig Gradisher, in a lawsuit against the City of Akron and various police officers. I'd like to reserve three minutes for rebuttal. This case is about a citizen's clearly established right to be free from egregious police misconduct. In reviewing the trial court's granting a summary judgment, this court applies that the noble standard of reviewer must construe all the facts in light most favorable to the non-moving party, in this case, the plaintiff. This court should reverse the district court's granting a summary judgment on the excess of coarse claims, there were many material questions of fact, and should reverse the district court's granting on the form of a statutory claim, and instead grant plaintiff's motion for a summary judgment for the following reasons. By weighing the evidence, the district court failed to adhere to the most fundamental principles of the summary judgment of the differences being drawn in favor of the non-moving party. There were no exigent circumstances to justify the courtless entry into plaintiff's homes, and the officer's use of force was excessive, as he was not resisting arrest at the time. Here, plaintiff demonstrated his Fourth Amendment right as the officer's claim when he locked the door and went back inside. All the officers agreed, plaintiff had no obligation to answer the door or talk to him. This is a clearly established right, as in 2005, the Cummings v. City of Akron case. In fact, when the plaintiff went outside of his house and asked the officers, why'd you keep giving it to me, referring to the taser, one of the officers said, when the police are outside, you answer your door. There were no exigent circumstances to justify this entry. Well, Mr. Gratister had made, what, four phone calls, 911 calls of one nature or another, that would give rise to some concern by police officers, would it not? And then you pair that with the incident that occurred at the bar, and perhaps the officers thinking that he had a gun. I mean, there was a lot going on that would give rise to concern by officers that there might be something unsafe going on in the house. Wouldn't you agree with that? I do not agree, Your Honor. You put all that together from an officer's perspective? I still don't believe it. I think if you look, if this was a 911 call such as the Thacker v. Columbus case that Chief Cole was on, that was a high-priority 911 call, where somebody's indicating, hey, there's attempted suicide, the officers appear on scene, there's bleeding. On this case, when Dana does call 911, he does use profanity. He's reporting an individual having a gun at Georgie's Pub, a bar that he was at earlier. He never makes any mention of anyone having a gun at 402 Klein. Dispatch never indicates hearing somebody in the background crying, screaming. He never requests any emergency aid while the officers are on scene. They never hear screaming, gunshots. In fact, when they see him come out back, he never looks as if he's bleeding or injured. There's no threats. There's nothing there that a reasonable officer would believe. Well, let me just ask you just one factual point. The way we have to look at the record here in the light most favorable to you, I guess, do we take it as true that the officers see him out the back door or not? Because I thought your client said he didn't go out there. So, I mean, which view of that particular fact do we take? If the court, if we do take the officer's indication, and I would concede if he came out and they say that they saw him, when he comes out, he's moving, they don't see anything. But I'm asking what, okay. I mean, there's a certain, you know, set body of facts at this stage of a qualified immunity appeal that we have to say, okay, that is what we assume is true. Is this one of those facts in your view or not? I would say that's a contested fact, Your Honor. Did your client specifically say he didn't do that? He says that he locked his door before, after he makes his call, and he goes to take a shower in his basement. As this court has indicated, the record, for an officer to go into the house, he has to point to specific and articulable facts. The record is void of any specific or articulable facts to justify the entry. Well, what about this fact? The officers say at the scene they checked for any outstanding warrants to the address and they found a failure to appear warrant from the Akron Police Department. So what, did your client have an arrest warrant outstanding? It was for $26.50 that he believed he paid court costs. I believe it was like some traffic violation or something minor that he believed that he paid. But they check and they find basically there's an arrest warrant, right, to bring him in for failing to appear. All the officers do testify that when they were there, they were not executing on the warrant. They did not go and knock and announce, as would have been the law, if they were going to enter. Well, they did knock, they did knock, and they wanted to come in, but they did knock and announce. They didn't knock and announce. I mean, why wouldn't that, I guess my question is, why wouldn't that give them the right to come, they saw him come out the back door, they knew he was there, if there was an outstanding arrest warrant, the law says, hey, you can go in to arrest somebody. My understanding would be when they're knocking and announcing, they would be knocking and announcing and indicating they're executing on the warrant, which they're not. They're claiming they're going in and purely entering for a welfare check, which it's not supported in the record of that either. It's not in any of the call notes, the records, the transcripts. It appears as soon as they contact their sergeant and say he's not answering, Sergeant Yerrick goes, hey, do you want to put the boots to the door? Sergeant Yerrick, in the conversation, he seems to be more worried about what the media thinks. In fact, one of it is I felt like to me it wasn't about our rights to go in there, it was our duty, our obligation, not only for their safety, but also to protect ourselves from looking like fools on national TV. He seems to be quite concerned. With reasoning such as that, not supported by the facts at the scene or from what dispatcher's telling, you could force entry for any reason. I must say it does sound, my impression is your client was sort of a drunken jerk at the time. Now maybe even drunken jerks don't have Fourth Amendment rights, but still he had drank too much, he was obnoxious. And that is correct, Your Honor, is he did use, but in the U.S. we still do have First Amendment rights that we are allowed. Obnoxious people have rights, I understand. And that is not correct. Unfortunately, here the use of force was not objectively reasonable. When they found Mr. Gratischer in the basement, he puts his feet out and he says he put his hands up and said, you got me. In fact, Officer Hackathorn, who found him not seeing any threat, holsters his service revolver and goes to grab Dana's left arm. Let me stop you there. First of all, we have to do the analysis for qualified immunity individually as to each defendant. So it wasn't clear to me from the briefs. Describe for me the sequence of events where they find him in the basement. I thought one officer comes down alone, and then all of a sudden we got a gaggle and he's getting tased like crazy. So just kind of walk through that. What occurs is they're going through the four officers in the house. Officer Hackathorn comes down, he's in the basement. There's going to be the question, did they ever announce they're the police? He finds the sheet, he's shining his flashlight, he sees Dana. He removes the sheet. Within less than four seconds, he has the sheet off. He holsters the weapon and he goes to grab. Officer Kraft is in the basement. Then he's the one with the taser. Wait a minute. So now there's one officer in the basement. When does the second officer come? Within the sheet being removed, probably within ten seconds of finding him. Three to four seconds. Does he holler and a guy comes down or something? They just come down. I don't remember if he says he's here. Officer Kraft then shoots the taser, striking Dana. As it's going through that cycle, the other two officers, Ledbetter and Smith, come down. At that time, Kraft is in front with the taser. You have Ledbetter or Smith, I believe, is on the right. Hackathorn is on the left. And at the stairway, the only way out is Officer Ledbetter providing lethal cover as it goes. What did Hackathorn do wrong here in your view? I believe with the excessive force, it's going to come down to Officer Kraft repeatedly tasing Dana. And because he wasn't resisting. I mean, one of the questions that we have is the officers, Kraft would have been trained to give a taser warning before each cycle. Why he says, he said, place your hands behind your back, you're under arrest, you're going to be tased. This isn't supported by the record. Smith never heard this initial warning. During all these taser cycles, which there's four cycles, or four pulls, five cycles, Ledbetter says, I only heard one warning. And it came after Dana had already been through the first cycle because he saw him clammed up. Clammed up, does that mean like fetal position? Contorted, having some effects when I asked in the deposition. Yeah, clammed up somehow. Is there evidence in the record that that's sort of a common automatic reaction to people who get tased? I believe that this court has recognized in some cases. In fact, in the recent decision, I believe, of Goodwin versus the city of Painesville, there were three officers on scene and it was alleged that the suspect was refusing arrest and he was convulsing. So I think clammed up, convulsing, I think are contorting are many different wordings that we could have. You know, as I read your briefing, I got the sense that your argument is that Mr. Gratisher was passively resisting. And you say in the brief, the sole reason Dana, I guess that's his middle name, was repeatedly tased was he would not obey the command to give up his right hand. And that is correct, Your Honor. And one of the questions, in fact, was, was he even mentally or physically capable of complying? He says the current was nonstop, I can't move, and he might have blacked out, which the taser log shows it was four pulls, five seconds in a 35-second. I guess I'm trying to focus on the point just before the tasering. So was there, is the position that Mr. Gratisher is presenting here that he was, there was some passive resistance. He refused to give up his right hand to either Officer Kraft or Hackathorn. And then after that, was tased. I believe, Your Honor, is when before he was even tased, not seeing a threat, Officer Hackathorn put his gun away. That's when he's moving in. He doesn't see a threat if Dana's resisting. Certainly if the court wants to say he was resisting before the first pull, which we say he's not as Hackathorn puts his weapon away, certainly the subsequent tasings, there's no resistance. It's not coupled, even if he was passively resisting, the question is was he even mentally and physically able. As this court has pointed out, in Bauer v. Cincinnati, a three-second gap isn't sufficient time to recover. I think Judge, Chief Judge Cole's question is, does your client, well, as I understand it, I mean, does your client testify that he refused to give up his hand or not? No. What is your view of that issue? The record shows that when the sheet was removed, he put his hands up and his feet out. And that's when Hackathorn went in. So his hands are up. Mm-hmm. In your view of the record, what happens between his hands up and him getting tasered? To his hands. What happens with his hands? Hackathorn comes and grabs the left arm. Okay, so you're saying he still has the right hand up? The right hand is over here, and as Hackathorn is grabbing, almost immediately the record should reflect he's tased. You're saying while his hands up? While his hands up or moving, is Hackathorn getting the one to get it behind? Because he controls the left arm the whole time, and then he's tased. And from there, if he blacked out or the current is going every? Well, I guess what I'm trying to understand is the brief seems to indicate, I thought, correct me if I'm wrong, that Mr. Gratisher just refused to give up one of his hands to Officer Kraft or Hackathorn before he was tased, and that that and maybe more constituted passive resistance, as I read your brief. Now, maybe I'm not reading your brief accurately. With all due respect, Your Honor, I believe that that is mistaken. The record does reflect he is being tased almost immediately as Hackathorn is grabbing the left. He's grabbing one, and then he's being struck by the current. I know your time has expired. I was trying to focus on that four to six seconds or whatever it is before the tasing occurred. And the brief says that Mr. Gratisher would not obey the command to give up his right hand, suggesting that there was some resistance. That's what you say in your brief, but apparently the deposition testimony maybe doesn't support what you have in the brief. It's just not clear to me. I believe that was a contention of Kraft that he was resisting. It is not because when he was being tased— You're citing from the Kraft deposition that—I see, I see. I believe my brief where you're reading, I broke it down to Dana's perception and then also from the officer's. So you're just— I try to present— I see, I see. That makes sense. That's helpful. Thanks. Great. That was helpful. Mr. Reese. Good morning. I'm John Christopher Reese. I represent the appellees in this case, the police officers as well as the city of Akron. I'll start out with addressing two points that came up during the argument. I'll go off script on this. Judge Gilman, you know, it's interesting that you touched on does a drunken jerk have constitutional rights. You know, I often look at this case and I think, Mr. Gratischer drinks nine beers and a shot of whiskey. He calls 911 four times. He deadbolts the front door when the police get there. He runs out the back, sees the police, runs back in. He goes down the basement and hides under a sheet. All that behavior, and Mr. Gratischer somehow is claiming that the Fourth Amendment protects that kind of behavior. I submit to you that, you know, the Fourth Amendment is not a complicated amendment. It protects against unreasonable behavior. Whose behavior in this situation was unreasonable? No, it protects against unlawful, unreasonable searches of a person's home without a warrant. Right, right, right. And even obnoxious people are protected from unreasonable searches. Just an observation. But the second observation is... Well, wait a minute. I mean, just because you're drunk doesn't mean you don't have Fourth Amendment rights. And, I don't know, so what? I mean, he drinks ten beers, deadbolts his thing, and they see him hopping around on the back porch. That does not mean the cops can blast down the door. That's not the way the Constitution has ever been interpreted, I think. Right. There's one factor that didn't come up in my friend's argument, and that is the gun. Okay, if there was no gun involved in this... Well, it wasn't... As he reported it, he's not the possessor of the gun, right? Well, the police officers arrive on the scene, and they simply don't know who possessed it. Wait a minute. I mean, he calls 911 and says another patron of the bar had the gun. And that is the information, isn't it, that was relayed to the officers? I mean, let's talk about the level of generality at which they got the information. Not somebody has a gun. He reported some other person at the bar, a different location, had the gun. But when the officers, again, when the officers had gone to the bar themselves, Officer Hackithorn and Officer Kraft, they took a report from the bartender and the bar patron there who put a gun or discussions of a gun in Mr. Gratish's possession. I got a gun out in my van. Let's go out and have a gunfight or whatever that might be. So understand that when the officers arrive on the scene of Klein, they're starting to piece this together, and they're wondering, okay, somebody's got a gun. I don't know. Is there somebody in the house? At this point, they don't even know that Mr. Gratish's name is Mr. Gratish. Well, is your client's theory of the case that it's the welfare check that authorizes the breaking down of the door as opposed to the outstanding arrest warrant? That's correct. One important point to remember about the warrantless entry in this case, they did not enter this house to arrest Mr. Gratish for 9-1-1 abuse. They didn't enter this house necessarily to execute the arrest warrant. They entered the house without a warrant for the welfare check, for the emergency aid. That's what they explained to their spouse. What's your best case that allows a welfare check as a basis to break a door down without a warrant? Well, the case of Johnson v. City of Memphis is the leading 9-1-1 case from this court. What I understand about 9-1-1 exigent circumstances cases is this. When a 9-1-1 call is what puts the officers on the scene, it red flags it. 9-1-1 is a call for help from somebody. So the officers show up on a 9-1-1 call, and I'll concede to the court and to counsel that if you just simply get a 9-1-1 call, you can't run on the scene and barge in the door. The 9-1-1 calls require the officers to gain or acquire additional circumstances or unusual things once they get on the scene. So I think the answer to your question, that's a long answer to your short question, I think the Johnson v. City of Memphis case and then my brief sightseeing. The problem with your analogy to Johnson is that in Johnson the door was open, right? I believe that's true. Yes, and that's a big difference. I mean, if the police officers show up and the door is open, they walk in. Here they break down a door. And then in my brief, for purposes of brevity, I string sight the other 9-1-1 exigent circumstances cases that this court has decided. And I piece them all together and I say, what would an officer take away from that? What he takes away from that is a simple 9-1-1 call is not enough. A 9-1-1 call puts you on the scene and gives you the idea or the theme that there's maybe an emergency here. And then when you arrive on the scene and you gather additional unusual circumstances, but you're not getting answers, you're just getting more questions. You know, Judge Leoy pointed out her opinion. If I can, I question whether we treat 9-1-1 calls in gross the same for the analysis we're doing here. I mean, doesn't it matter what the caller said? I mean, the one case where the person apparently is suicidal, that's one kind of 9-1-1 call. A 9-1-1 call where somebody says another guy at a bar had a gun, that's a different kind of 9-1-1 call. And shouldn't we treat those differently for purposes of whether you can force entry through the door? I would agree with you, Judge. And when there's one 9-1-1 call and somebody says, you know, somebody's beating me up, and it's that simple of a call, the dispatcher will advise the officers that that's what the call is. In this case, if you listen to these 9-1-1 calls, it takes you a half an hour or 45 minutes to listen to them. The dispatcher really reported or advised the officers that this guy, there's something wrong, that he's berating the caller. He hung up, he called back, he hung up, he called back. Not necessarily the content of the call, but the 9-1-1 calls, the officers took away that there's some bizarre behavior going on. People don't typically call 9-1-1 four different times and keep calling back, keep calling back, keep calling back. So it's a little bit different than your simple, clean call. I understand what you're saying. Well, if you add to that the question that Judge Ketelich asked earlier, and I'm not sure how we look at this quote-unquote fact, you know, whether Mr. Gratisher actually went out the back door, saw an officer, and retreated into the house. How does that play one way or the other, assuming that's a fact that we can consider? Judge, that's bothered me, too, because Mr. Gratisher throughout the case in the lower court kind of wants it both ways. He wants to deny running out the back door, but if you want to believe he ran out the back door, his clothes weren't tattered and he wasn't bleeding, he wasn't screaming and things like that. I'm troubled by the fact that Mr. Gratisher argues both sides of that question. Which side do you think we should take? This is the side I think that's reasonable. It may have not been Mr. Gratisher. They didn't know the name Gratisher when they showed up. For purposes of summary judgment, you can take the fact that Mr. Gratisher denied it was him, but you have to accept the fact that Officer Ledbetter saw somebody, somebody run in and out the back. It could have been the person. Gratisher could have had the gun. This could have been the guy that needed help. So you can kind of justify on summary judgment at least. You don't have to make a credibility decision. Both facts can coexist in my mind. You cannot dismiss the fact that the officer saw a person. Is it? A person deadbolted the door. Mr. Gratisher claims that that wasn't him deadbolting the door. Well, you still can take on summary judgment the fact that an officer heard someone deadbolted. Didn't he say the officer at the time, like on the line with the dispatcher or whatever, that, well, I just saw somebody come out? Correct. That's correct. Yeah, that was reported over the radio. So it's not just his testimony, but while this is happening, we have a recording or something of him saying, I just saw this guy. Okay. It's one of those, I don't know, you could classify it sort of generically as an excited utterance or something. I mean, he didn't make it up when he went back and wrote his report on that thing. I see someone coming out, it lends some credibility. So, I mean, is it reasonable to tie this whole issue of what happened at Georgie's Bar, and I guess the bartender reported that a person who would fit the description of probably 30% of the population said he was going out to his white van to get a gun because he had words with the guy at the bar who had a gun in his pocket or something like that, that somehow it was reasonable, whatever the standard is, for the officers to tie that report to Mr. Gratisher being in the house and making these calls, and somehow they could reasonably believe there was this gun that had been possessed by Mr. Gratisher. That would add to the 9-1-1 calls, so it wouldn't just be the four 9-1-1 calls. It wouldn't just be the exiting the back of the house and retreating. There's a gun in the house. I think Sergeant Urich makes reference to the fact that I think there might be a hostage or something like that going on in the house. So, I mean, is it reasonable to tie those two things together, 9-1-1 calls and whatever happened in the Georgie's Bar? It is, Your Honor, because you understand you've got to look at a map. The Georgie's Bar and 402 Klein Avenue are very, very close together. That's why the two officers who took the report at the bar knew white man, white van, height and weight, and then they hear Klein Avenue, 9-1-1 calls. That's why they responded to it also. It's not across town. They drove a short block or two, and they pull up, and they're like, Whoa, white van. Run the license plate and find a warrant. Get a picture or a description of Mr. Gratisher from the outstanding warrant. White male. Seems to be the same size. Something's not right here, and that's when they knock on the front door. That's a reasonable step to take. I guess what's not right about it? So a guy says he's going out to his van. He's got a gun in it, but there's no other indication that there's a hostage or anything else going on in the house. They don't suspect that. They want to dispel that. Think about what Mr. Gratisher, and this is more our argument, but think about what Mr. Gratisher proposes. All those things I listed earlier, Mr. Gratisher proposes that he has a constitutional right for those officers to just say, Eh, get in their cruisers and drive away. I'm not sure that's what the Constitution contemplates. I think the Constitution contemplates that it's reasonable for the officers to get some answers. Just get some answers about what's going on here. This is unusual stuff. Had Mr. Gratisher come to the door and said, That was me. She made me mad, the dispatcher. I shouldn't have done it. Give me mercy. I don't know. I don't know. It would have turned out differently. But it's not unreasonable for the officers to... It's not unreasonable to knock on the door and inquire. The question is do they cross the threshold when they break down the door? So that's what we've got to wrestle with. Talk about, though, what happened in the basement. Why isn't there a genuine dispute of material facts that would require us to reverse the granting of qualified immunity for all the tasing that took place in the basement? Here's the appellee's position on that. First of all, again, this was not in my brief, but Mr. Gratisher, at deposition, can't remember making the 911 calls because he was too intoxicated. He denies or can't remember the EMS being at the scene at the end of the day. He claims the police officers pulled the barbs out of him. He denies EMS ever showed up. But somehow in this case there's crystal clarity and a memory about what happened under that sheet in the basement. Sounds like a good cross. With that said, I have to take his story. And good crosses are really fun. If you want to look at this case in terms of passive resistance, noncompliance versus active resistance, I don't necessarily think that's a good idea. Or no resistance is your opponent's argument. The law is clearly established that you cannot use a taser on a merely passively resistant or merely noncompliant person. Stand up. Stand up. Stand up. The law seems to be developing, and I'll concede, at least for the purpose of standing here today, that you can't use a taser. In the Eldridge case, which was 2013 out of this court, here's the quote from the case. There's a common thread in our case law that noncompliance alone does not indicate active resistance. There must be something more. There is something more in this case. Let's go back to the line of questioning we had with Mr. Hameimi, which is, I mean, he does clearly testify. He's got his hands up. As soon as the sheet's off, okay, you got me. Game over. Okay? And then Hathaway, if I remember, Officer H-something, Hackathorn, is securing his left hand. But at least in the exchange we had a few minutes ago, it seems the record is his right hand is up in the air, and that's when he gets tased. If that's true, why don't you lose at this stage of the case? Officer Kraft testified in his deposition that he didn't tase him for the noncompliance or the nonresistant behavior. Officer Kraft testified that he tased him because of the fear or the thought that he may have of God. But he's got, I mean, if, do we have to take the record to be that he's got the right hand in the air and the left hand is under control by the other officer? Do we have to take, is that the record, you know, as we have to take it at this stage of the case? You have to take, I believe the court has to accept that as Mr. Gratish's description of his body movement. Okay. But Officer Kraft's intention in using the taser is nonresistant. No, I understand, I understand your point there. But if we have to take that, his subjective intention really doesn't matter here. It's whether a reasonable officer at that point could have had the same fear, I guess, that he described. And if he's got one arm secured and the other arm up in the air and he's just said, you got me, then why is it reasonable for an officer to blast him with a taser at that point? Officer Kraft did not. Let's forget about Officer Kraft. I mean, I'm not trying to be rude, but the question is an objective officer, and maybe he gave the objective reason. But why is it reasonable for, you know, objectively for an officer to shoot the taser at that point? I guess my response to that would be, you know, I went back and read the Hocker case, which was out of this court, and it made an interesting point. I guess putting the right hand up means I'm giving up, and that seems to be Mr. Gratish's position in this case. But in that Hocker case, this court held the subjective intent. The subjective intent of Mr. Gratisher doesn't play. I thought it's the subjective of the off. Well, okay, I'm sorry. Please go ahead. Right. It's whether or not the officer could objectively believe that those body movements are indicative of making movements. Well, if this is a threatening body movement, what isn't? You know, really, what can a person do not to get tased? If that's a threatening body movement with the other arm secured, what in the world can a person do? Still reach down. No, I mean, what can they do not to get tased? To show that they're not trying to comply, I'm not trying to threaten you, officer. You know, what can they do if that's not good enough? Had there not been the gun component, had there not been the officer safety component in this, which is what that Eldridge case said, had we just had that fact, I would agree with you. We'd be going to trial on this. Question of fact, there is something when that Eldridge court or this Eldridge court said there must be something more in a passive-resistant or noncompliant, and that something more in this case that nobody wants to discuss except me is the officer safety component. They're in a basement, he's under a sheet, but people don't hide under sheets unless, I don't know. Well, not because they have a gun, maybe they're just trying to avoid, he thought it was a motorcycle gang people coming down to the basement. See, you could have a lot of fun cross-examining this stuff. I tell you that the officer crafts a testimony that is really not refuted about why he tased him, and he didn't tase him for noncompliant behavior or passive resistance. He tased him for officer safety until they got the handcuffs on him, and they figured out that he doesn't have whatever this gun that was reported hiding under a sheet in a confined area in the basement. I mean, think about it, and I'll leave you with this. Two mistakes in this case have been made overall, and one of them is to violate this court and many courts' admonition about second-guessing and looking back. You know, we're in a beautiful courtroom. It's easy to make those points now. We're talking about a guy under a sheet in a confined basement with a gun call and all kinds of uncertainty going on. It's not unreasonable for an officer for his own safety to use a taser. That's less than some courts, this court has held, that's less than physical force. All right, well, we have to wrestle with that. Your time expired just a bit ago. We had a lot of questions for you. The divide-and-conquer, as far as the exigent circumstances go, the divide-and-conquer method of having ten headings in your brief and saying none of these are sufficient alone, it's a totality, whether it's a criminal case. We got it. Okay. Thank you, Mr. Reese. Thank you very much. Thank you. Mr. Hememi. I would like to address Judge Gilman's question with the 911 and the Johnson case. The Johnson case also dealt with a hang call, a hang 911 call where you call dispatch, somebody hangs up and dispatch calls back right away and somebody answers. That is what occurred here. Also, this wasn't a 911 call. Had it been, it would have been a priority two or higher. Or if it was a gun call, that would have been like Georgie's pup. This was a priority five, the lowest priority you could go to investigate a 911 abuse of the emergency one system. Also, what about the officer observing someone run out the back door and run back inside? That adds to just these four calls. If that would have been a victim or something, certainly we don't think a victim is going to be in the house locking the door. If the police are knocking or running out the back, you're at the house, you're going to go. I'm not going to go back into the danger. And again, when I keep hearing about a gun, a gun, there was never any indication that there was a gun at 402 Cline. It was said it was at Georgie's pup. Nobody saw a gun there. As the officers go through this house, nobody ever sees any witness. The record will reflect a gun in the house, any evidence of a gun, bullets, holster, anything. It's immaterial that this might have been a gun. And if that gets you, your exigent circumstances is in U.S. Versailles, where there was officers responded to shots fired at a resident. They observed a suspect holding a gun, but there was no reason to go in because no threats were made, no crimes were made. And with this threat of a gun, as Kraft testified, the sole reason he tased Dana was he said he wouldn't give up his hand. There was no other resistance in there, no other threats. He never threatens anyone. He doesn't try to punch the officers during all the subsequent tasings. He never swears. This case is clearly distinguishable from a lot of the cases that show some resistance being coupled, such as Williams versus Sandville that Judge Kethledge was on. That was where the individual pulls the taser, probes out, he's given time to comply. Dana's resistance for not giving his hand was the three to four second gap. If he was even able to recover, as all the officers testify, and Kraft saying his hand was moving, he even acknowledges he could have been putting his hand out to brace himself if, in fact, he was going. I submit to you that the first tasing and certainly the subsequent tasings are all excessive. And recent opinions out of this court were time-wise. He was tased the five cycles and 35 seconds. A recent decision of Brown versus Weber, an individual was tased three times in a 16-second period. The court found that that wasn't reasonable. Additionally, these officers were dispatched for a low-level crime in entering the house again. As the U.S. Supreme Court said in Welsh versus Wisconsin, it's difficult to conceive where a warrantless entry would be justified for such a low-level crime. I do see that my time is up. If I may briefly conclude. Very briefly. Yes. In seconds. Yeah. I would ask this court to remand this case as there were many material questions, in fact, with regards to the warrantless entry and to reverse the district court's granting of summary judgment and instead grant the plaintiff's motion in light of the proper case law. Thank you. Okay. Thank you, counsel, both of you, for your arguments today. The case will be submitted and the court will take a brief recess.